

# ST. JOHN'S SCHOOL OF LAW

## LEGAL STUDIES RESEARCH PAPER SERIES

---

## Free-Market Failure: The Wells Fargo Arbitration Clause Example, 70 Rutgers U.L. Rev. (forthcoming Nov. 2017)

### 17-0004, May 25, 2017

### Jeff Sovern

E-mail Comments to:
sovernj@stjohns.edu
St. John's University School of Law
8000 Utopia Parkway
Queens, NY 11439

This paper can be downloaded without charge from The Social Science Research Network Electronic Paper Collection at: http://ssrn.com/abstract=2961347.

# Free-Market Failure: The Wells Fargo Arbitration Clause Example

## © Jeff Sovern[*]

## Abstract

In September 2016, regulators charged Wells Fargo with opening millions of unauthorized accounts on behalf of its customers. When some of those customers filed class actions against Wells, the bank initially responded by moving to compel arbitration on the ground that the consumers had agreed to arbitrate disputes and waive their class action rights. Because most customers with claims in small amounts would probably have foregone filing an arbitration claim, the effect would have been to leave their damages uncompensated except for the refunding of fees, which Wells agreed to in the consent order it entered into with regulators.

The Consumer Financial Protection Bureau has proposed a regulation which, if it had been in effect at the relevant time, would have enabled the injured Wells customers to obtain class action relief. But the proposed rule is encountering objections in Congress, based partly on free-market economic theory. This Article argues that free-market economics is not sufficient to protect consumers from the type of problem present in the Wells Fargo case for two reasons. First, free-market economics assumes that consumers have complete information while empirical evidence shows that consumers do not understand arbitration clauses, much less that consumers realize that such clauses would bar class actions as to fraudulent accounts that the consumers did not know about. Second, the number of primary checking accounts at Wells consistently increased as the fraud became public, suggesting that the free market did not discipline Wells for its misconduct until regulators intervened, and did so only modestly at that point. It is even possible that by enforcing arbitration clauses as written, free-market economics prolonged the Wells fraud, thus enabling more consumers to be injured.

In short, some device beyond the free market is necessary to prevent financial institutions from cheating many consumers out of small amounts. Class actions are one such device, but arbitration clauses as currently enforced enable financial institutions to prevent their use, thus reducing their incentive to comply with the law.

---

[*] Professor of Law, St. John's University School of Law. The author thanks Dee Pridgen, Christine Lazaro, David Horton, Nicole C. Rende, Kathleen Spellman, and the editors of the Rutgers Law Review for inviting him to participate in this symposium.

**Introduction**

Our country uses four main mechanisms to restrain companies from misconduct. Three are self-restraint,[1] the marketplace,[2] and governmental enforcement of consumer laws.[3] A fourth is lawsuits from injured consumers, especially in the form of class actions. In recent decades, however, many companies have shielded themselves from class actions and most consumer lawsuits by inserting arbitration clauses into their contracts with consumers.

The Wells Fargo sham account scandal, one of the most significant recent consumer frauds involving a financial institution, offers a case study in the relative effectiveness of these mechanisms. This article proceeds as follows. Part I reports on the Wells Fargo scandal. Part II explains the Consumer Financial Protection Bureau's proposed arbitration regulation. Part III discusses the opposition to that regulation based on free-market economics, while Part IV points out the problems with free-market economics as applied to arbitration, with particular reference to the Wells Fargo scandal. In brief, Part IV shows how the assumptions underlying free-market economics do not apply to arbitration and that the market did not effectively discipline Wells when it came to the unauthorized accounts.

## I.      The Wells Fargo Scandal

On September 4, 2016, regulators charged Wells Fargo Bank, N.A. with opening as many as two million unauthorized accounts in its customers' names.[4] In one instance, for example, the bank had reportedly opened a credit card account for one of its customers, Aaron Brodie, without Mr. Brodie's knowledge.[5] By the time Mr. Brodie learned of the account from debt collectors, it had accumulated more than $1300 in unpaid fees, which lowered his credit score, making it difficult for him to obtain a mortgage, and increasing his borrowing expenses.[6]

---

[1] For examples when self-restraint failed, see infra note --.

[2] See notes -- and accompanying text infra.

[3] See notes -- and accompanying text infra.

[4] See In re Wells Fargo Bank, N.A., Consent Order (Sept. 4, 2016), at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf. Later estimates put the number of unauthorized accounts at 3.5 million. See Plaintiff's Supplemental Briefing in Response to Court Inquiries 1-2, Jabbari v. Wells Fargo & Co., No. 15-cv-02159-VC (N.D.Ca. May 17, 2017).

[5] See Emily Glazer, Christina Rexrode and AnnaMaria Andriotis, Wells Fargo Is Trying to Fix Its Rogue Account Scandal, One Grueling Case At a Time, Wall St. J., Dec. 27, 2016, https://www.wsj.com/articles/wells-fargo-is-trying-to-fix-its-rogue-account-scandal-one-grueling-case-at-a-time-1482855852.

[6] Id.

In a consent order with the regulators, Wells promised to refund the fees it had charged customers on the unauthorized accounts and pay $185 million in fines.[7] News of the agreement prompted nationwide headlines and congressional hearings.[8] But because Mr. Brodie's account was already in collection, the bank allegedly told him they could not help him.[9] Meanwhile, attorneys responded to stories like Mr. Brodie's by filing a dozen class action suits on behalf of Wells customers against the bank to recover damages.[10]

Despite clear evidence that customers' signatures had been forged when sham accounts were opened,[11] and Wells Fargo acknowledgments that it had opened unauthorized accounts,[12] Wells

---

[7] See In re Wells Fargo Bank, N.A., Consent Order, Part VII (Sept. 4, 2016), at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.

[8] For samples of news coverage, see infra notes ---.  For the congressional hearings, see Senate Comm. On Banking, Housing, & Urban Aff., An Examination of Wells Fargo's Unauthorized Accounts and the Regulatory Response, Sept. 20, 2016, https://www.banking.senate.gov/public/index.cfm/hearings?ID=B80F9B81-4331-4F95-91BC-718288EC9DA0; House Fin. Svcs. Comm., "Holding Wall Street Accountable: Investigating Wells Fargo's Opening of Unauthorized Customer Accounts," Sept. 29, 2016, http://financialservices.house.gov/calendar/eventsingle.aspx?EventID=401082.

[9] See Emily Glazer, Christina Rexrode and AnnaMaria Andriotis, Wells Fargo Is Trying to Fix Its Rogue Account Scandal, One Grueling Case At a Time, Wall St. J., Dec. 27, 2016, https://www.wsj.com/articles/wells-fargo-is-trying-to-fix-its-rogue-account-scandal-one-grueling-case-at-a-time-1482855852.

[10] For an example of a class action complaint against Wells for opening the fake accounts, see Mitchell v. Wells Fargo Bank, N.A. Case No. 2:16-cv-00966-CW (filed Sept. 16, 2016), at http://assets.documentcloud.org/documents/3114172/Utah-Case.pdf. What may have been the earliest case brought against Wells Fargo for opening unauthorized accounts was filed in 2013, but was not a class action.  See Rebekah Kearn, Man Complains of Forgery at Wells Fargo, Courthouse News Serv., September 13, 2013, http://www.courthousenews.com/man-complains-of-forgery-at-wells-fargo/.

[11] See Consolidated Amended Complaint, Jabbari v. Wells Fargo & Co., No. 15-cv-02159-VC (N.D.Ca. July 13, 2015), https://assets.documentcloud.org/documents/3114173/Wells-Amended-Cmplt.pdf; Michael Hiltzik, How Wells Fargo Exploited a Binding Arbitration Clause to Deflect Customers' Fraud Allegations, L.A. Times, Sept. 26, 2016, www.latimes.com/business/hiltzik/la-fi-hiltzik-wells-arbitration-so160926-snap-story.html. The two signatures below, which appeared in the Jabbari complaint, purport to be from the same Wells customer:



initially responded by moving to compel arbitration on the theory that the cases could not be heard in court or in a class action because the consumers had agreed to arbitrate the disputes, waive their class action rights, and leave the question of arbitrability to the arbitrator.[13] The motions succeeded in at least one case.[14]

Wells arbitration clauses were in fact written broadly enough to cover unauthorized accounts as to existing customers. For example, one Wells agreement defined a dispute as "any unresolved disagreement between you and the Bank. It includes any disagreement relating in any way to the Card or related services, Accounts, or matters . . . . It includes claims based on broken promises or contracts, torts, or other wrongful actions."[15]

When small consumer disputes are diverted to individual arbitration, the impact is often not only to change the forum in which the dispute is heard, but also to make it economically unfeasible to bring the case at all.[16]  In contrast, claims for smaller amounts that are heard in court can be resolved, when appropriate, by class actions—a device that arbitration clauses typically forbid, as was true of the Wells arbitration clauses.[17] As a result, it appeared that the effect of Wells Fargo's invocation of its arbitration clause would be to block injured consumers with small

---

[12] See Testimony of John Stumpf, Chief Executive Officer of Wells Fargo & Company, House Committee on Financial Services (Sep. 29, 2016), http://financialservices.house.gov/uploadedfiles/hhrg-114-ba00-wstate-jstumpf-20160929.pdf ("accounts were opened and products were provided to customers that they did not authorize or want").

[13] See Wells Fargo Asks Court to Force Customers to Arbitration in Fake Accounts Cases, N.Y. Times (Nov. 24, 2016), at https://www.nytimes.com/2016/11/24/business/wells-fargo-asks-court-to-force-customers-to-arbitration-in-fake-accounts-cases.html?_r=0. For an example of such a Wells motion, see Jabbari v. Wells Fargo & Co., No. 15-cv-02159-VC, Defendants Notice of Motion and Motion to Compel Arbitration of Plaintiff Kaylee Heffelfinger's Claims (Aug. 14, 2015), https://assets.documentcloud.org/documents/3114171/Wf-Motion-to-Compel.pdf (arguing that under the arbitration agreement, the arbitrator rather than the court was to decide whether the case was to be resolved through arbitration).

[14] See Jabbari v. Wells Fargo & Co., No. 15-cv-02159-VC, Order Granting Defendants' Motion to Compel Arbitration (N.D.Ca. Sept. 23, 2015), https://assets.documentcloud.org/documents/3114174/Wf-Arb-Case.pdf (issue of arbitrability is for the arbitrator to decide under the agreement).  See generally  Michael Corkery and Stacy Cowley, Wells Fargo Killing Sham Account Suits by Using Arbitration, N.Y. Times Dec. 6, 2016, at https://www.nytimes.com/2016/12/06/business/dealbook/wells-fargo-killing-sham-account-suits-by-using-arbitration.html?hp&action=click&pgtype=Homepage&clickSource=story-heading&module=first-column-region&region=top-news&WT.nav=top-news&_r=0.

[15] See Wells Fargo Consumer Credit Card Customer Agreement & Disclosure Statement section 31(a) at http://files.consumerfinance.gov/a/assets/credit-card-agreements/pdf/6_2016_Wells%20Fargo%20Advisors%20Premium%20Rewards%20Visa%20Signature%20Credit%20Card%20Agreement%20and%20Disclosure%20Statement.pdf.

[16] See infra notes – and accompanying text.

[17] Class actions can also be heard in arbitration if the parties agree.

claims from obtaining compensation beyond that provided by the consent decree.  Even consumers who brought claims in arbitration were likely to lose procedural options available in court litigation, options that might spell the difference between winning and losing.[18]  Moreover, research has shown that companies that arbitrate frequently—so-called "repeat players"--have a significant advantage over consumers.[19]  In other words, invocation of the Wells Fargo arbitration clause was likely to have a profound impact on the ability of injured Wells customers to obtain compensation.  Perhaps even worse, Wells Fargo's use of an arbitration clause might have enabled Wells to extend its fraud and so afflict more consumers.[20]

The Wells Fargo motions generated considerable criticism.[21]  Members of Congress proposed legislation to prevent Wells from shifting the cases to arbitration.[22]  Wells may also have feared that the likelihood of a battle in Congress and the press over an anticipated regulation barring financial institutions from using arbitration clauses would further damage the bank's reputation.[23]  In any event, notwithstanding its success in defeating the class actions in court, on March 28, 2017, Wells reported reaching a $110 million settlement of the class action claims,[24]

---

[18] Such options include the right to appeal and access to discovery devices.

[19] See David Horton & Andrea Cann Chandrasekher, After the Revolution: An Empirical Study of Consumer Arbitration, 104 Georgetown L. J. 57 (2015).  See also Michael Hiltzik, Here's Why Wells Fargo Forces its Customers Into Arbitration: It Wins Most of the Time, L.A. Times, April 7, 2017.

[20] See infra notes – and accompanying text.

[21] See Jim Puzzanghera & James Rufus Koren, Senator to Push Bill to Let Wells Fargo Customers Sue Over Unauthorized Accounts, L.A. Times, Oc. 3, 2016, http://www.latimes.com/business/la-fi-wells-fargo-arbitration-20161003-snap-story.html  (Quoting presidential candidate Hillary R. Clinton as saying "We are not going to let corporations like Wells Fargo use these fine-print 'gotchas' to escape accountability.").  See also  Michael Hiltzik, How Wells Fargo Exploited a Binding Arbitration Clause to Deflect Customers' Fraud Allegations, L.A. Times, Sept. 26, 2016, www.latimes.com/business/hiltzik/la-fi-hiltzik-wells-arbitration-so160926-snap-story.html. ("In the category of adding insult to injury — or perhaps piling one injury on top of another — Wells Fargo is an expert. . . . ." the article also refers to the Wells Fargo as "abusive.").

[22] H.R. 1414 (115th Cong., 1st Sess.), https://www.congress.gov/bill/115th-congress/house-bill/1414/text (Justice for Victims of Fraud Act of 2017).

[23] See infra notes – and accompanying text;  Renae Merle, What Wells Fargo dodged by agreeing to pay $110 million to settle fake accounts case, Wash. Post, March 30, 2017, https://www.washingtonpost.com/news/business/wp/2017/03/30/what-wells-fargo-dodged-by-agreeing-to-pay-110-million-to-settle-fake-accounts-case/?utm_term=.ef23c8244610 (Resolving the suit, legal experts say, could help keep Wells Fargo, already struggling to repair its imagine from the sham accounts scandal, from becoming the center of what many expect to be a contentious debate next year over the fairness of the arbitration process.).

[24] See Dorothy Atkins, Wells Fargo To Pay $110M To End Phony Accounts Suits, Law360 (March 28, 2017), https://www.law360.com/consumerprotection/articles/907284/wells-fargo-to-pay-110m-to-end-phony-accounts-suits?nl_pk=757d28d3-3e54-41fb-b1f1-3bf59ec4e167&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection. Commentators have speculated on Wells Fargo's motivations in settling rather than relying on its arbitration clauses to defeat the class action litigation.  See Renae Merle, What Wells Fargo dodged by agreeing to pay $110 million to settle fake accounts case, Wash. Post, March 30, 2017, https://www.washingtonpost.com/news/business/wp/2017/03/30/what-

which was later raised to $42 million.[25]  The settlement is subject to court approval, and after some class members opposed the settlement, [26] the court indicated that it was "inclined to grant the motion for preliminary approval," provided certain conditions were satisfied.[27]  in light of objections by class members.  It may be that Wells still benefited from the arbitration clauses despite deciding to waive arbitration because conceivably the threat of refusing to waive the clause enabled Wells to negotiate a more favorable settlement than would otherwise have been the case.[28]

In light of Wells Fargo's decision to waive its arbitration clause, it may be less useful as a case study in examining the impact of arbitration on consumer protection than it might otherwise have been. But in any event, it remains highly instructive as a case study with regard what happened *before* Wells entered into the settlement agreement.  Nor is Wells Fargo's decision to waive its arbitration clause a typical response to the filing of a class action. The considerations that probably led Wells to do so are rare for consumer financial disputes subject to arbitration. Congressional committees do not normally hold hearings devoted to the misconduct of a single financial institution, and members of Congress do not commonly introduce bills directed at a single company's misbehavior.  Wells did not have a legal obligation under existing law to forego its class action waivers, and if the settlement agreement fails to obtain court approval, Wells might yet resume its insistence on arbitration.  In short, there remain important lessons about arbitration to learn from the Wells Fargo cases.

## II.     The CFPB's Proposed Arbitration Regulation

---

wells-fargo-dodged-by-agreeing-to-pay-110-million-to-settle-fake-accounts-case/?utm_term=.ef23c8244610 ("[P]ressure on the bank, one of the largest in the country, has been building. Democratic lawmakers in the House and Senate have introduced legislation to allow Wells Fargo customers to sue despite the arbitration clauses . . . .).

[25] See James Rufus Koren, Wells Fargo ups sham-account settlement to $142 million, making more customers eligible, L.A. Times, Apr. 21, 2017, at http://www.latimes.com/business/la-fi-wells-settlement-plan-20170421-story.html.

[26] A number of class members have filed objections to the settlement. See, e.g, Mitchell Plaintiffs Objections to Proposed Settlement Agreement and Motion for Preliminary Approval (May 18, 2017); Alex Chernavsky & William Castro's Response in Opposition to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and for Certification of a Settlement Class; and Renewed Motion to Intervene on Behalf of Privacy Class (May 18, 2017); Objections of Plaintiffs/Class Representatives and Certified Classes in MDL 2036 to Preliminary Approval of Stipulation and Agreement of Class Action Settlement and Release (May 15, 2017).

[27] See Jabbari v. Wells Fargo & Co., Order re Motion for Preliminary Approval, No. 15-cv-02159-VC (N.D.Ca. May 24, 2017) (The conditions were that "the parties resubmit a settlement agreement, proposed notice, and claim form consistent with the discussion of [certain] issues . . . .").

[28] See Michael Hiltzik, No Surprise: Wells Fargo is Leveraging its Arbitration Clause to Win an Advantageous Scandal Settlement, L.A. Times, March 31, 2017.

Arbitration clauses are normally enforceable under the Federal Arbitration Act.[29]  But in 2010, Congress authorized the CFPB to regulate arbitration clauses in consumer financial contracts, provided it first studied them.[30]  Any resulting regulation had to be based on findings "consistent with the study" and "in the public interest and for the protection of consumers."[31]  On March 10, 2015, the Bureau issued its study, representing the most exhaustive study ever conducted of consumer arbitration.[32]

On May 5, 2016, the CFPB proposed a regulation to bar the use of class action waivers in arbitration clauses.[33]  The Bureau's proposal would permit companies to continue inserting arbitration clauses in their agreements, but would block them from including class action waivers in the arbitration clauses.[34]  Had such a rule been in effect in time to apply to the Wells sham accounts, Wells would not have had the option of shunting the class action claims off to arbitration.

The CFPB's proposed rule rests in part on the claim-suppressing effect of class action bans.[35]  While consumers could theoretically still assert individual claims in arbitration, the Bureau study

---

[29] See 9 U.S.C. § 2 ("a written provision . . . in a contract evidencing a transaction involving interstate commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of such contract."). Congress has provided that arbitration clauses are not enforceable in certain types of contracts, such as mortgages issued after June 1, 2013.  See 15 U.S.C. § 1639c(e) (2012) (prohibiting arbitration clauses in residential mortgage loans and open end credit loans secured by the consumer's principal dwelling).

[30] See 12 U.S.C. § 5518(a).

[31] See 12 U.S.C. § 5518(b)

[32] Consumer Fin. Prot. Bureau, Arbitration Study Report to Congress, Pursuant to Dodd–Frank Wall Street Reform and Consumer Protection Act § 1028(a) (2015), http://files.consumerfinance.gov/f/201503_cfpb_arbitration-study-re-port-to-congress-2015.pdf (hereinafter, CFPB Arbitration Study).

[33] See BUREAU OF CONSUMER FINANCIAL PROTECTION, Arbitration Agreements, 12 CFR Part 1040 4 (May 5, 2016), http://files.consumerfinance.gov/f/documents/CFPB_Arbitration_Agreements_Notice_of_Proposed_Rulemaking.pdf.  (hereinafter, "Arbitration Agreements").

[34] A class action waiver is a term that waives the right of a party to participate in a class action.

[35] See Arbitration Agreements, supra note – at 107 ("The Bureau preliminarily finds, based upon the results of the Study, that arbitration agreements have the effect of blocking a significant portion of class action claims that are filed and of suppressing the filing of others."). Indeed, the blocking of class actions appears to be the reason for the use of arbitration clauses in consumer contracts. See id. at 108; Jeff Sovern, CFPB Arbitration Plan Provokes Dubious Industry Claims, American Banker, Nov. 13, 2015, https://www.americanbanker.com/opinion/cfpb-arbitration-plan-provokes-dubious-industry-claims.

The Bureau summarized its preliminary findings on which the proposed rule would be based as follows:

provided empirical confirmation of Judge Posner's famous observation that "The *realistic* alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30."[36]  Thus, the CFPB study found that consumers rarely bring claims for $1,000 or less to arbitration.[37]  The study also reported that when arbitration clauses caused the dismissal of class actions, few of the putative class members brought individual claims.[38]

### III.  Opposition to the CFPB's Proposed Regulation and Free-Market Economics

The CFPB proposal drew opposition from several quarters.  One was Congressional Republicans.  On May 4, 2017, the House Financial Services Committee passed the Financial Choice Act, [39] authored by the Committee's Chair, Jeb Hensarling.  The bill would eliminate the CFPB's power to regulate arbitration clauses in consumer financial contracts.[40]  Even if Congress does not enact the Financial Choice Act, Congress would have the power to rescind

---

(1) the evidence is inconclusive on whether individual arbitration conducted during the Study period is superior or inferior to individual litigation in terms of remediating consumer harm; (2) individual dispute resolution is insufficient as the sole mechanism available to consumers to enforce contracts and the laws applicable to consumer financial products and services; (3) class actions provide a more effective means of securing relief for large numbers of consumers affected by common legally questionable practices and for changing companies' potentially harmful behaviors; (4) arbitration agreements block many class action claims that are filed and discourage the filing of others; and (5) public enforcement does not obviate the need for a private class action mechanism.

Arbitration Agreements, supra note – at 92.

[36] Carnegie v. Household Int'l, Inc., 376 F.3d 656, 661 (7th Cir. 2004) (emphasis in original).

[37] CFPB Arbitration Study section 5 at 21, 23 (of 1,185 disputes in which parties sought monetary relief, only 74 involved claims of $1,000 or less). See also David Horton & Andrea Cann Chandrasekher, After the Revolution: An Empirical Study of Consumer Arbitration, 104 Georgetown L. J. 57 (2015) (In the entire four-and-a-half years covered by our study, only 184 of all 4,839 consumers in our sample demanded under $1,000"); Jessica Silver-Greenberg and Robert Gebeloff, Arbitration Everywhere, Stacking the Deck of Justice, N.Y. Times, Oct. 31, 2015, https://www.nytimes.com/2015/11/01/business/dealbook/arbitration-everywhere-stacking-the-deck-of-justice.html?action=click&contentCollection=DealBook&module=RelatedCoverage&region=EndOfArticle&pgtype=article ("by assembling records from arbitration firms across the country, The Times found that between 2010 and 2014, only 505 consumers went to arbitration over a dispute of $2,500 or less.").

[38] See Arbitration Agreements, supra note – at 110 ("for the 46 class cases identified in the Study in which a motion to compel arbitration was granted, there was only an indication of 12 subsequent arbitration filings in the court dockets or the AAA Case Data, only two of which the Study determined were filed as putative class arbitrations.").

[39] The bill is available at http://financialservices.house.gov/choice/.  Section 738 would repeal the section authorizing the Bureau to regulate arbitration clauses.

[40] House Financial Serv. Comm., Committee Approves Financial CHOICE Act to End Bank Bailouts, Promote Economic Growth (May 4, 20170, https://financialservices.house.gov/news/documentsingle.aspx?DocumentID=401894. .

any arbitration rule the Bureau issued under the Congressional Review Act,[41] or by passing a bill to rescind it.

Chairman Hensarling's support for the Financial Choice Act is rooted at least in part in his belief in free-market economics.  In his view, "the best consumer protection there is is a competitive, innovative market with freedom of choice for consumers."[42]  During a hearing on the Wells Fargo scandal, he observed that he believes in markets rather than individual businesses.[43]  Hensarling arrived at his love of free-market economics while studying economics:

> I didn't know why I was a Republican until I studied economics. I suddenly saw how free-market economics provided the maximum good to the maximum number, and I became convinced that if I had an opportunity, I'd like to serve in public office and further the cause of the free market . . . .[44]

Free-market economics has considerable appeal, stemming in part from its view that sellers and buyers who are able to enter into whatever agreements they want will reach agreements that are efficient, meaning, among other things, that consumers obtain what they want at the lowest possible cost.[45]  The theory assumes that market participants have perfect information and behave rationally.[46]  Suppose that government obliges sellers to provide a term, such as making it

---

[41] See 5 U.S.C. 801 et seq.

[42] See Brad Wolverton, Tweet  (March 17, 2017, 3:15 p.m.) ("More from my @RepHensarling interview: "I believe that the best consumer protection there is is a competitive, innovative market with freedom of choice for consumers. That's what prevents consumer from getting ripped off with a $50 hamburger—it's called competition.").

[43] See Tom Benning, Disappointed Wells Fargo Customer Jeb Hensarling Grills Bank's Scandal-Ridden CEO, Dallas Morning News (Sept. 29, 2016), at http://www.dallasnews.com/news/politics/2016/09/29/disappointed-wells-fargo-customer-jeb-hensarling-grills-banks-scandal-ridden-ceo ("This sordid affair reminds me why I trust markets but not individual businesses  . . . .").

[44] Joseph Guinto, Jeb Hensarling: *The GOP's Most Powerful Nobody*, DMAGAZINE, (Nov. 2009), available at http://www.dmagazine.com/publications/d-magazine/2009/november/jeb-hensarling-the-gops-most-powerful-nobody/.  For Mr. Hensarling's views on the CFPB specifically, see Elizabeth Gurdus, House Financial Services chair: CFPB is an unelected 'dictator' that must be stopped, CNBC (Feb. 16, 2017), http://www.cnbc.com/2017/02/16/house-financial-services-chair-cfpb-is-an-unelected-dictator-that-must-be-stopped.html (quoting Hensarling as saying "no person in America . . . should have the power, unilaterally, to decide what credit cards should go in our wallet, whether or not we can have a mortgage, and whether or not, if we like our banker, we can keep her. . . . [The CFPB] is damaging the most important consumer protection there is, and that is competitive, innovative, transparent markets that give Americans the freedom of choice.").  But see CFPB, Credit card agreement database, https://www.consumerfinance.gov/credit-cards/agreements/ (database of hundreds of credit card issuers' credit card agreements available to consumers).

[45] See James Kwak, ECONOMISM 18-24 (2017) (showing how economic theory predicts prices will equal the marginal cost of producing the item sold); Paul A. Samuelson & William D. Nordhaus, Economics 152 (19th ed. 2010) (same).

[46] See Samuleson & Nordhaus, supra note – at 164 ("The invisible-hand theory assumes that buyers and sellers have complete information about the goods and services they buy and sell.").

possible to resolve disputes in class actions.  If that term increases sellers' costs, they will need to raise their prices to recoup the additional cost.[47]  Put another way, buyers will be obliged to pay a higher cost to obtain the product.  But buyers presumably don't want that term at the increased cost, or sellers would provide that feature without being forced to do so by regulation.[48] Consequently, regulation obliges buyers to pay more for products because they are obtaining the products with a feature they value less than it costs.[49]  As a result, consumer surplus declines, and we have a less than optimal equilibrium.[50] Alternatively, buyers buy less of the items than they would have purchased at the lower cost, and again we have a less than optimal equilibrium.[51]  In sum, free-marketers believe any deviation from the agreement that sellers and buyers want to strike, forced by regulation, necessarily leaves buyers worse off than they would be in the absence of regulation.[52] Consequently, free-market economics argues that government should generally leave contract terms alone.[53]

---

[47] Cf. ECONOMISM, supra note – at 132 ("From the standpoint of economism, . . . financial regulations simply prevent people from engaging in mutually beneficial transactions . . . .").

[48] For more about the traditional approach of economics to government intervention, see Paul Krugman & Robin Wells, Economics 131-155 (4th ed. 2015).

[49] See Samuelson & Norhaus supra note – at 30 (explaining how economist Adam Smith "wrote hundreds of pages railing against countless cases of government folly and interference. . . . Smith argued that such restrictions . . . limit the proper workings of the market system and ultimately hurt both workers and consumers.").

[50] See Samuelson & Norhaus supra note – at 96 ("The gap between the total utility of a good and its total market value is called consumer surplus. The surplus arises because we 'receive more than we pay for' as a result of the law of diminishing marginal utility."). Put another way, consumers receive less value for their dollar when providers are subject to government regulation than when they are not.

[51] Another way of thinking of this phenomenon is that the regulation has shifted the supply curve  leftward, which raises prices and so lowers the quantity buyers are willing to purchase.  See generally Samuelson & Norhaus supra note – at 55-56.

[52] See Thomas A. Durkin, Gregory Elliehausen, Michael E. Staten, & Todd J. Zywicki, CONSUMER CREDIT AND THE AMERICAN ECONOMY 416 (2014):

> Those who take the opposite view frequently argue that competition in the marketplace protects consumers more effectively than regulation. In this view if markets are competitive, then malefactors and unsavory practices ultimately will lose out to better ones, and government will not have to make decisions about how markets should operate or tell consumers what they can and cannot choose to do. . . . Since strong adherents to this position typically also contend that markets are quite competitive, they also often argue that there is little need for government intervention beyond basic rules establishing a legal system that recognizes the validity of contracts between willing parties.

[53] See generally Russell Korobkin, Bounded Rationality, Standard form Contracts, and Unconscionability, 70 U. Chi. L. Rev. 1203, 1209-11 (2003).

Commentators have in fact applied this logic to arbitration clauses.[54] Stephen J. Ware has explained: "businesses using adhesive arbitration agreements do so because those businesses generally find that those agreements lower their dispute-resolution costs. . . . this benefit to businesses is also a benefit to consumers . . . . because whatever lowers costs to businesses tends over time to lower prices to consumers."[55]

This reasoning is seductive. It is, in fact, an illustration of what James Kwak calls Economism in his book of the same name: "the premise that people, companies, and markets behave according to the abstract, two-dimensional illustrations of an Economics 101 textbook, even though the assumptions behind those diagrams virtually never hold true in the real world."[56]  Kwak views Economism as an ideology that is used to justify restraints on regulation.  He argues that unrealistic assumptions create theories that inaccurately describe the results of policy judgments. In fact, when it comes to arbitration clauses, free-market theories do indeed rest on assumptions at odds with actual consumer behavior, and like other models that depends on unrealistic assumptions, lead to inaccurate conclusions as to the functioning of the markets.[57] For example,

---

[54] See Comment by the American Bankers Assoc., Consumers Bankers Assoc., & Financial Serv. Roundtable, Comments on the Bureau's Proposed Arbitration Rule 9 (Aug. 22, 2016) ("The additional costs associated with the increase in class action lawsuits will result in higher prices, fewer choices, and lower quality services for consumers as providers pass their costs onto their customers."); U.S. Chamber of Commerce, Comments on Proposed Rulemaking on Arbitration Agreements 68-69 (Aug. 22, 2016) ("one reason businesses prefer to resolve disputes in bilateral arbitration is that arbitration offers a less expensive forum for the resolution of disputes, which lowers businesses' legal costs.  This, in turn, leads to cost savings that can be passed along to consumers.").

[55] Stephen J. Ware, The Case for Enforcing Adhesive Arbitration Agreements--with Particular Consideration of Class Actions and Arbitration Fees, 5 J. Am. Arb. 251, 254-55 (2006). Ware, acknowledged, however, that no empirical evidence supported his claim, see id., at 256 n.8, though he also pointed out that at that time, no empirical evidence undermined his claim either.  More recently, the CFPB Study refuted Ware's claim. See CFPB Study, supra note -, at --. For more sources claiming that arbitration clauses or class action waivers reduce costs, see Amy J. Schmitz, Building Bridges to Consumer Remedies in International eConflicts, 34 U.A.L. Rev. 779, 779-80 (2012) ("companies often include arbitration clauses in their contracts to cut dispute resolution costs and produce savings that they may pass on to consumers through lower prices."); Community Financial Services Assoc. of Am., Comment on Arbitration Agreements—Proposed Rule 4 (Aug. 22, 2016) ("a ban on class action waivers would increase the legal exposure and legal defense costs of companies that provide consumer financial products . . . . For some lenders, absorption of these costs may be unsustainable and lead to an exit from the marketplace, resulting in fewer choices for consumers."). Courts have also made similar comments about forum selection clauses, which are somewhat similar to arbitration clauses. See IFC Credit Corp.v. United Bus. & Indus. Fed. Credit Union, 512 F.3d 989, 993 (7th Cir. 2008) ("As long as the market is competitive, sellers must adopt terms that buyers find acceptable; onerous terms just lead to lower prices;" analogizing to arbitration clauses); Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 594 (1991) ("it stands to reason that passengers who purchase tickets containing a forum clause like that at issue in this case benefit in the form of reduced fares reflecting the savings that the cruise line enjoys by limiting the fora in which it may be sued").

[56] ECONOMISM, supra note – at 6-7.

[57] Among the many examples Kwak provides is one that seems analogous to arbitration clauses.  Here is his description of the toxic mortgages that led to the foreclosure crisis and the Great Recession in turn:

> The fact that ordinary human beings could not understand the legal documents they were signing was a crucial feature of the entire [mortgage] system, not a bug.  According to economism, an unregulated

the CFPB study found that credit card issuers offering contracts with arbitration clauses did not raise prices after eliminating arbitration clauses, thus contradicting the theory that arbitration clauses reduce prices.[58] The next section explores more fully whether the assumptions undergirding free-market economics hold true when applied to arbitration clauses as well as how the market responded to the Wells Fargo account scandal.

## IV. The Problems with Applying Free-Market Economics to Arbitration Clauses and the Wells Fargo Scandal

### A. The Assumptions Underlying Free-Market Economics Do Not Apply to Arbitration Clauses.

When it comes to arbitration clauses, the assumptions that consumers have perfect information and are rational seem particularly in question. In combination, these assumptions lead free market economists to believe that consumers will make decisions in accordance with their own best interests and preferences. If that were so, then departures from the deal sellers and buyers strike would indeed yield the inefficiencies free market economist warn against. But consumers often do not have perfect information and are not always rational, with the result that the agreement consumers and sellers enter may in fact not be optimal.

Two recent studies bear on the question of whether consumers have, or even can have, perfect information about arbitration clauses.[59] Though the studies used different methodologies, they both raise serious doubt about the extent to which consumers understand arbitration clauses. Obviously, if consumers do not understand arbitration clauses, the assumptions underlying free-market economics are inapplicable to them.

One of the studies, *Whimsy Little Contracts*, which I co-authored, surveyed 668 consumers online. We showed the respondents a contract with an arbitration clause printed in bold and italics. Key parts were also in ALLCAPS, including a section that said they could not participate as a representative or member of a class.[60] Then we asked them questions about the arbitration

---

mortgage market will maximize the number of value-creating transactions between buyers and suppliers of credit. Instead, the lack of regulation made it possible for millions of borrowers—aided and abetted by mortgage brokers and lenders—to take out loans they had little chance of repaying.

ECONOMISM, supra note – at 145. Similarly, consumers seem unable to understand arbitration clauses, as discussed infra note – and accompanying text.

[58] See CFPB Study, supra note -, at --.

[59] See Jeff Sovern, Elayne E. Greenberg, Paul F. Kirgis, & Yuxiang Liu, 'Whimsy Little Contracts' with Unexpected Consequences: An Empirical Analysis of Consumer Understanding of Arbitration Agreements, 75 Md. L. Rev. 1( 2015); CFPB Arbitration Study, supra note --.

[60] See Whimsy Little Contracts, supra note –, at 90 ("*YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OF CLAIMANTS, OR AS A PRIVATE ATTORNEY GENERAL, PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION*."). In addition, the first page of text in the contract (the

clause, including two questions about class actions.  Despite the contract provision providing that consumers could not participate in class actions arising out of the credit card agreement, four times as many respondents thought they could be in a class action as realized that they couldn't.[61]  Only twelve percent recognized that the arbitration clause blocked them from being included in a class action while 48% believed it did not.[62]

The *Whimsy Little Contracts* study also attempted to determine whether respondents understood that class action waivers are enforceable.  Another question described a scenario, concluding: "Suppose the contract said you could not join with other consumers to bring a class action. Could you be included in a class action against the credit card company, either in court or in arbitration or both?"[63]  Less than a third of the respondents correctly replied that they could not be.[64]  As one respondent put it, "I don't see how they could preclude us from filing a class action suit through filing a whimsy little contract."[65]  The United States Supreme Court does.[66]

When the answers to the two survey questions were read in conjunction, they raise even more troublesome questions about the ability of consumers to understand the impact of arbitration clauses containing class action waivers.  Only six percent of the respondents answered both questions in the negative, while more than a fourth wrongly gave positive answers to both questions.[67]  In other words, more than four times as many respondents believed that a contract with a class action waiver did not in fact include such a clause and that if it did, wrongly thought it unenforceable, as recognized a class action waiver when they saw one and knew that it was enforceable.

The performance of the *Whimsy Little Contracts* respondents on class action questions was not an aberration.  Overall, the study raises concerns both about whether consumers correctly

---

second overall) said, again in bold: "**This agreement contains an arbitration provision (including a class action arbitration waiver). It is important that you read the entire Arbitration Provision section carefully.**" Id. at 86.

[61] Whimsy Little Contracts supra note –, at 51-52.

[62] Whimsy Little Contracts supra note –, at 52.

[63] Whimsy Little Contracts supra note –, at 54.

[64] Whimsy Little Contracts supra note –, at 54 (36.5% answered "yes;" 28.9% clicked "no;" and 34.6% selected "I don't know").  Though the differences between "yes" answers and "no" answers were within the survey's margin of error, more than twice as many respondents chose either "yes" or "I don't know" as  correctly replied "no."

[65] Whimsy Little Contracts supra note –, at 55.

[66] See AT&T Mobility LLC v. Concepcion, 131 S. Ct. 1740 (2011) (states cannot categorically invalidate class action waivers in arbitration clauses as unconscionable).

[67] Whimsy Little Contracts supra note –, at 55.

interpret arbitration clauses and whether they appreciate that they are enforceable.  Respondents entered more than 5000 answers to the eight questions that had correct and incorrect answers—but only a quarter of their answers were right.[68] While less than one percent selected correct answers to all eight questions, nearly a fifth did not choose any correct answers.[69]

The second survey of consumers' understanding and awareness of arbitration clause was conducted by the CFPB as part of its massive study of arbitration.[70] The Bureau asked consumers about their actual credit card contracts and then examined those contracts to determine if the respondents correctly understood their credit card terms.  Though the Bureau's study employed a different methodology from the *Whimsy Little Contracts* study, to the extent that its survey addressed the same issues as *Whimsy Little Contracts* survey, its results were similar.   For example, the Bureau study found that 56.7% of the respondents whose credit card contracts included class action waivers nevertheless believed they could participate in class actions.[71] The Bureau also reported that less than seven percent of its respondents whose contracts *included* arbitration clauses realized that they could not sue the credit card issuer in court—which was statistically similar to the proportion of respondents whose credit card contracts *lacked* arbitration clauses who believed they could not sue their credit card company in court.[72]

The Bureau's study also found that consumers generally did not take into account dispute resolution terms when deciding which credit card to seek.[73]  Similarly, the *Whimsy Little Contracts* survey found that the arbitration clause was salient to few respondents.  In response to

---

[68] Whimsy Little Contracts supra note –, at 64.

[69] Whimsy Little Contracts supra note –, at 64.

[70] CFPB Arbitration Study, supra note --, at section 3.

[71] CFPB Arbitration Study, supra note --, section 3 at 4. The 8% difference between the *Whimsy Little Contracts* respondents and the CFPB study respondents may owe something to the fact that the Bureau's respondents were asked to remember a credit card contract they might not have reviewed in some time (or ever) while the *Whimsy Little Contracts* respondents had been shown the contract immediately before answering the questions.

[72] CFPB Arbitration Study, supra note --, section 3 at 4 (7.7% of respondents without arbitration clauses so stated). Similarly, only 14% of the Whimsy Little Contracts respondents realized that the contract they saw would block them from suing in court.  Whimsy Little Contracts supra note –, at 46.

[73] CFPB Arbitration Study, s upra note --, section 3 at 4:

> When asked an open-ended question regarding all the features that factored into their decision to get the credit card that they use most often for personal use, no consumers volunteered an answer that even implicitly referenced dispute resolution procedures . . . .

> When presented with a list of nine features of credit card (*e.g.,* interest rates, customer service, rewards) and asked to identify those features that factored into their decision, consumers identified dispute resolution procedures as being relevant less often than any of the other eight options.

an open-ended question asking respondents to list five items they recalled from the credit card contract, only three percent of the respondents mentioned the arbitration clause, despite the fact that it appeared in bold print and italics, with portions in ALLCAPS. Two other items that respondents remembered at least as frequently did not appear in bold, italics, or ALLCAPS.[74]

To the extent that the free market requires rational actors with perfect information, it is difficult to see how it will function on behalf of consumers who typically overlook class action waivers and, when they do become aware of them, often assume that the waivers are unenforceable.[75] If consumers cannot determine which contracts include arbitration clauses and which do not, they will be unable to tell which companies use such clauses and so cannot effectively try to avoid companies which do, if they want to do so. Moreover, consumers who believe that arbitration clauses do not bar them from joining a class action or suing in court have little reason to avoid contracts with arbitration clauses. That may help explain why the Wells Fargo customers agreed to a term that enabled Wells to defraud them and leave them without any effective means of redress. If consumers cannot understand arbitration clauses, we surely cannot expect them to anticipate that the clauses protect banks that open sham accounts in their names.[76]

### B. The Market Did Not Discipline Wells Fargo Effectively for the Unauthorized Accounts

Free-market advocates argue that the market disciplines bad actors by depriving them of customers and ultimately putting them out of business.[77] Consequently, it is useful to examine how consumers have responded to Wells for opening the unauthorized accounts.

---

[74] Whimsy Little Contracts supra note –, at 41.

[75] According to one economic theory, markets can achieve efficient results even when some consumers are unable to act in their best interests or uninterested in doing so as long as a large enough critical mass of other consumers exists that merchants want to meet the needs of that critical mass and can't distinguish between them and less informed consumers. See Alan Schwartz & Louis L. Wilde, *Intervening in Markets on the Basis of Imperfect Information: A Legal and Economic Analysis*, 127 U. Pa. L. Rev. 630 (1979). But as noted in Whimsy Little Contracts, supra note – at pp. 74-76, the theory seems inapplicable to arbitration clauses in general and class action waivers in particular, in part because it is unlikely that the requisite critical mass of awareness and understanding exists for arbitration clauses.

[76] See Declaration of Kaylee Heffelfinger in Support of Plaintiffs' Opposition to Defendants' Motion to Compel Arbitration, Jabbari v. Wells Fargo & Co., No. 15-cv-02159-VC (Sept. 10, 2015) ("When I opened my original accounts with Wells Fargo and enrolled in online banking with Wells Fargo, I did not intend to agree to give up my right to sue Wells Fargo for opening up accounts that I did not know about and that were not related to my original accounts.").

[77] See E. Scott Reckard, Lawsuits put heat on Wells Fargo but investors barely notice, L. A. Times, May 14, 2015 (quoting Susquehanna Financial Group's analyst Jack Micenko as to the Wells scandal that "the free-market system suggests clients would leave if they were uncomfortable . . . .").

That task is complicated by uncertainty concerning the timing of the fraud, as might be expected of a fraud carried on without official sanction by employees responding to incentives created by their employer. The consent decree refers to the period from 2011 to 2015, implying that that was when employees were opening the unauthorized accounts,[78] though some fraudulent accounts were opened nearly a decade earlier,[79] and in January 2010, the Office of the Comptroller of the Currency discussed with senior bank management 700 whistleblower complaints it had received concerning the fraud.[80] The fraud first drew media attention in 2013 when the Los Angeles Times reported that Wells employees were opening unauthorized accounts for customers.[81] That was also the year that the CFPB received its first whistleblower tip on the matter[82] and in which former Wells CEO John Stumpf later testified that he learned of the fraud.[83] While 2015 may be a plausible ending date for the scandal, as it was the year in which

---

[78] See In re Wells Fargo Bank, N.A., Consent Order Para. 15 (Sept. 4, 2016), at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/092016_cfpb_WFBconsentorder.pdf.  See also Paul Blake, Timeline of the Wells Fargo Accounts Scandal, ABC News (Nov. 3, 2016), at http://abcnews.go.com/Business/timeline-wells-fargo-accounts-scandal/story?id=42231128.

[79] See e.g. Independent Directors of the Board of Wells Fargo & Co., Sales Practices Investigation Report 31, 73 (2017) (Wells Fargo's internal investigation found increase in annual sales gaming cases from 2000 to 2004; investigation also disclosed employees in Colorado branch issuing unauthorized debit cards in 2002); Stacy Cowley, At Wells Fargo, *Complaints About Fraudulent Accounts Since 2005*, N.Y. Times, Oct. 11, 2016, https://www.nytimes.com/2016/10/12/business/dealbook/at-wells-fargo-complaints-about-fraudulent-accounts-since-2005.html.

[80] See Office of Enterprise Governance and the Ombudsman, Office of the Comptroller of the Currency, Enterprise Governance Supervision: Lessons Learned Review of Supervision of Sales Practices at Wells Fargo 5 (2017).

[81] See E. Scott Reckard, Wells Fargo's pressure-cooker sales culture comes at a cost, L.A. Times (Dec. 21, 2013), at http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story.html ("employees have opened unneeded accounts for customers, ordered credit cards without customers' permission and forged client signatures on paperwork."); E. Scott Reckard, Wells Fargo fires workers accused of cheating on sales goals, L.A. Times (Oct. 3, 2013), at http://articles.latimes.com/2013/oct/03/business/la-fi-mo-wells-fargo-workers-fired-20131003 ("Wells Fargo & Co. has fired about 30 branch employees in the Los Angeles region who the bank said had opened accounts that were never used . . . . One of the fired employees said that in some cases signatures were forged and customers had accounts opened in their names without their knowledge.").  See also Brian Tayan, The Wells Fargo Cross-Selling Scandal 2 (2016), at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2879102 ("In 2013, rumors circulated that Wells Fargo employees in Southern California were engaging in aggressive tactics to meet their daily cross-selling targets."); Independent Directors of the Board of Wells Fargo & Co., Sales Practices Investigation Report 26 (2017) (fraud "first came to public attention" through the L.A. Times articles).

[82] See Richard Cordray, Prepared Opening Statement of CFPB Director Richard Cordray before the House Committee on Financial Services (Apr. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/prepared-opening-statement-cfpb-director-richard-cordray-house-committee-financial-services/.

[83] See Ashlee Kieler, Wells Fargo CEO Stumpf Admits He Learned Of Fake Accounts In 2013, Consumerist, Sept. 20, 2016, at https://consumerist.com/2016/09/20/wells-fargo-ceo-stumpf-admits-he-learned-of-fake-accounts-in-2013/. See also Independent Directors of the Board of Wells Fargo & Co., Sales Practices Investigation Report 55 (2017) (Stumpf was notified of one incident in 2002 and received numerous customer and employee complaints which "he or his assistants referred to appropriate subordinates without further follow-up. According to Wells Fargo employees, concerns about sales practices and 'gaming' were raised with Stumpf during the 2012-2014

both the Los Angeles City Attorney suit and the first class action were filed,[84] a consultant Wells engaged reported allegations of employee-related sales misconduct continuing into the first quarter of 2016.[85]

Whatever dates for the fraud are chosen, it appears the marketplace did little if anything to discipline Wells for its misconduct before regulators stepped in. For example, Wells experienced more than twice as much growth in average deposits from 2014 to 2015 as did competitors like Bank of America, JPMorgan Chase, and Citigroup.[86]

One measure of market response is the number of active checking accounts: existing customers could punish banks by closing checking accounts while non-customers might open accounts elsewhere. Yet, as Figure One shows, in every quarter since the beginning of 2013—the year in which the scandal first became public—the number of primary checking accounts at Wells increased by at least 2.1% over the same quarter in the preceding year. In the first quarter of 2014—the first full quarter after the Los Angeles Times reported that Wells employees were opening unauthorized accounts—the number of checking accounts rose by 5.1% over the previous year. In each of the ten succeeding quarters, the number increased by at least 4.6%. In short, there is little reason to think the market would have put a stop to Wells Fargo's fraud if Wells itself or regulators had not done so. But belief in the free-market as a check on misconduct persisted. After the filing of at least one class action and the Los Angeles City Attorney's suit in 2015, a stock analyst explained "the free-market system suggests clients would leave if they were uncomfortable . . . and we have certainly not seen that with Wells."[87]

FIGURE ONE GOES AROUND HERE

Not only did the market not penalize Wells for its misconduct, some have charged it might actually have lengthened the period in which Wells continued its fraud by allowing Wells to rely

timeframe."). While the Independent Directors report indicated that the Wells board first heard of the problem in 2014, see id. at 67, a court opinion put it at 2013. See Shaev v. Baker, Case No. 16-cv-05541-JST (N.D. Ca. May 4, 2017).

[84] See Complaint for Equitable Relief and Civil Penalties, California v. Wells Fargo & Co., Case No. BC580778 (Cal. Supr. Ct. filed May 5, 2015), http://freepdfhosting.com/c7384fa6fc.pdf. See also the *Jabbari* complaint, filed in 2015, cited note – supra. Both filings drew media attention, albeit did not immediately lower Wells's stock price. See E. Scott Reckard, Lawsuits put heat on Wells Fargo but investors barely notice, L. A. Times, May 14, 2015 (Wells shares gained the day after filing of class action, which occurred the week after the City Attorney's filing ).

[85] See Independent Directors of the Board of Wells Fargo & Co., Sales Practices Investigation Report 33-34 (2017).

[86] Brian Tayan, The Wells Fargo Cross-Selling Scandal 7 (2016) (reporting that Wells growth was 7%, Bank of America was 3%, JPMorgan's was 2%, and Citigroup lost 5%; PNC and US Bank experienced slightly larger growth at 8%), at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2879102.

[87] See E. Scott Reckard, Lawsuits put heat on Wells Fargo but investors barely notice, L. A. Times, May 14, 2015 (quoting Susquehanna Financial Group's analyst Jack Micenko).

on its arbitration clause.[88] Of course, as with any counterfactual, it is impossible to know.  An arbitration clause might have such an impact for a variety of reasons. For example, had a class action proceeded, adverse court orders might have prompted Wells to alter its practices more quickly to reduce possible damages. In other cases, banks, and indeed Wells itself, have reacted to orders in a class action in one state by abandoning the challenged practices in other states whose citizens were not part of the class.  Thus, after a court ruled that Wells had reordered checks in violation of law in a California class action, Wells changed its practices in other jurisdictions not subject to the court's ruling.[89]  Conceivably, even a realistic threat of a class action might have caused Wells to move more quickly.  Class actions are thought to deter misconduct,[90] by changing the incentives a company faces when contemplating bad conduct. But the arbitration clause eliminated the possibility of adverse court orders, unless Wells agreed to submit to a class action.

Another, albeit less persuasive, reason a class action might have caused Wells to end its misconduct earlier is rooted in the contrast between the public nature of court proceedings and the private nature of arbitration proceedings.[91] An arbitration proceeding—possibly even including a trial—probably draws less publicity than what happens in open court. In theory, the marketplace not only did not penalize Wells Fargo's misconduct, but by reducing its perfidy's profile, may even have made it less likely that consumers would become aware of that perfidy, ironically insulating Wells from the scrutiny of the marketplace that free-marketers claim disciplines wayward businesses.

---

[88] See Michael Hiltzik, How Wells Fargo Exploited a Binding Arbitration Clause to Deflect Customers' Fraud Allegations, L.A. Times, Sept. 26, 2016, www.latimes.com/business/hiltzik/la-fi-hiltzik-wells-arbitration-so160926-snap-story.html; Robert Weissman and Lisa Donner, Why Wells Fargo got away with it for so long, The Hill (Sept. 20, 2016) at http://thehill.com/blogs/pundits-blog/finance/296706-why-wells-fargo-got-away-with-it-for-so-long.
Michael Hiltzik, Here's Why Wells Fargo Forces its Customers Into Arbitration: It Wins Most of the Time, L.A. Times, April 7, 2017 ("The absence of a public record may have allowed the Wells Fargo scandal to persist for years out of public view.").

[89] See Arbitration Agreements, supra note – at 32,858 (describing Wells Fargo's reaction to the court decision in Gutierrez v. Wells Fargo Bank, N.A., 730 F. Supp. 2d 1080, 1082 (N.D. Cal. 2010)).

[90] See Arbitration Agreements, supra note – at 32,858-59; id. at 32,862 ("deterrence is one of the primary objectives of class actions"). See also Reiter v. Sonotone Corp., 442 U.S. 330, 344 (1979) (class actions deter violations of the law).

[91] See Arbitration Agreements, supra note – at 53-54 (noting that court proceedings are usually public whilerbitration is private). For another example of a company allegedly using arbitration clauses to conceal misconduct, see Drew Harwell, Sterling discrimination case highlights differences between arbitration, litigation, Wash. Post., March 1, 2017, https://www.washingtonpost.com/business/economy/sterling-discrimination-case-highlights-differences-between-arbitration-litigation/2017/03/01/cdcc08c6-fe9b-11e6-8f41-ea6ed597e4ca_story.html?utm_term=.a6711fa81ce1.

Whether that aspect of arbitration really made a difference is debatable in the Wells case.  On the one hand, the bank's agreement to waive its arbitration clause suggests that Wells was sensitive to the public criticism it endured and would likewise have been sensitive to adverse publicity from, say, a trial. But the market seemed less sensitive.  The filing of the *Jabbari* class action and the Los Angeles City Attorney's lawsuit against Wells, both in May 2015, were followed by a 5.8% increase in deposits the following quarter.[92]  Whether the *Jabbari* class action would have had more of an impact on the market if the Wells motion to compel arbitration had not been granted and the class action allowed to proceed is an unanswerable question.

Even after regulators trumpeted Wells Fargo's misconduct in the September 2016 consent order, eliciting nationwide media attention and congressional hearings, the market seems to have punished Wells only modestly.  In the first full quarter after the consent order, checking accounts at Wells increased by 3.5% over the same quarter in the preceding year.  That figure is lower than in any quarter since 2013, but still shows an increase, demonstrating that many consumers are willing to bank at Wells, notwithstanding the fraud.

Of course, other measures of consumer engagement exist.  Brian Tayan has reported that customer visits to branches, credit card applications, and debit card applications all fell after the consent order was announced.[93]  According to the Los Angeles Times in March, 2017:

> New checking account opening are running an average of 40% behind the same months a year earlier, and new credit card accounts are down by almost 50%.  It isn't entirely clear whether the comparisons are so bad because the year-ago period includes bogus accounts.[94]

---

[92] The *Jabbari* class action complaint was filed on May 13,  2015.

[93] See Brian Tayan, The Wells Fargo Cross-Selling Scandal (2016), at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2879102:

> The long-term impact on the bank was unclear. Customer visits to branches declined 10 percent year-over-year in the month following the scandal. Credit card and debit card applications also fell. Deposits and new checking accounts, however, continued to grow—albeit at below-historical rates.

See also Jen Wieczner, Here's How Much Wells Fargo's Fake Accounts Scandal Is Hurting the Bank, Fortune, Jan. 13, 2017 ("In Wells Fargo's community banking unit—the retail division in which the scandal took place—quarterly revenues declined 5% while profits sank 14% compared to the same period in 2015. While the bank's new CEO Tim Sloan said the impact of the scandal itself on Wells Fargo's revenue "has not been significant," he acknowledged that if the slowdown in customer account growth were to continue at the current rate, "that would have a bigger impact."). And note that a decline in profits does not mean a loss.

[94] See Michael Hiltzik, Customers Still Seem Wary of Doing Business with Wells Fargo—with Good Reason, L.A. Times, March 21, 2017.  See also Associated Press, Wells Fargo Customers Continue to Shy Away from the Bank Amid Fallout from its Account Scandal, L.A. Times, March 20, 2017 ("[T]here is a silver lining for the bank: Its February numbers are up from December lows.").

But it appears that Wells is doing far better than, say, a failing bank would, despite its fraud, and was even before it settled the class actions. And during the period between the reporting of the fraud and the announcement of the consent order, Wells did not show ill effects from the scandal.

Other reasons for the arbitration clause prolonging Wells Fargo's misconduct are also plausible. Markets can also work through creating incentives. Those incentives encourage the supplying of consumers with items they want at appropriate prices, but they can also create incentives to generate profits by creating the illusion that consumers are receiving something of value.[95] Banks can increase revenue by serving more of their customer banking needs, and so during the years before its misconduct came to light, Wells Fargo created incentives for Wells employees to "cross-sell;" that is, to persuade existing customers to open additional accounts.[96] As then-CEO John Stumpf wrote, Wells "fight[s] like cats and dogs for those numbers!"[97] Some Wells employees responded to these incentives by fraudulently opening unauthorized accounts.[98] This

---

[95] See Jeff Sovern, The Risks of Unfettered Capitalism, N.Y. Times, Aug. 15, 2016 ("Capitalism may be the best economic system ever devised, but one of its drawbacks is that it provides financial incentives to harm and even kill people. Just ask those people who say they have been victimized by cigarettes, predatory lenders, Volkswagen diesel emissions, Takata airbags, General Motors ignition switches, Trump University, Vioxx, asbestos . . . .").

[96] See Emily Glazer,  At Wells Fargo, How Far Did Bank's Sales Culture Go?, Wall St. J., Nov. 30, 2015, https://www.wsj.com/articles/at-wells-fargo-how-far-did-banks-sales-culture-go-1448879643:

> In 1999, the bank said its customers on average used three of its products or services—the bank calls them "solutions"—and hoped to increase that number to eight.* * *

> That success, when many rivals have flailed, has its roots in a high-pressure sales culture, according to the lawsuit and conversations with employees. * * *

> [E]mployees, all of whom worked at the bank within the last five years, described having multiple meetings every day to discuss sales quotas and feeling intense pressure to meet those targets.

> Khalid Taha, a Wells Fargo personal banker in San Diego since November 2013, said he has daily and hourly sales goals in his branch in addition to the quarterly goals set by the company. Depending on the time of year, he said he has to produce 10 to 20 solutions a day.

See also E. Scott Reckard, Lawsuits put heat on Wells Fargo but investors barely notice, L. A. Times, May 14, 2015 ("Wells Fargo & Co. branches create a high-pressure sales environment for employees—one in which the threat of being fired weighs heavily on front-line bankers given quotas for new accounts, cards and credit lines.").

[97] See Independent Directors of the Board of Wells Fargo & Co., Sales Practices Investigation Report 54 (2017) (quoting John Stumpf email).

[98] Thousands such employees were fired.  See E. Scott Reckard, Wells Fargo's pressure-cooker sales culture comes at a cost, L.A. Times (Dec. 21, 2013), at http://www.latimes.com/business/la-fi-wells-fargo-sale-pressure-20131222-story; E. Scott Reckard, Wells Fargo fires workers accused of cheating on sales goals, L.A. Times (Oct. 3, 2013), at http://articles.latimes.com/2013/oct/03/business/la-fi-mo-wells-fargo-workers-fired-20131003.

enabled Wells to boast of its cross-selling success, which probably boosted stock prices.[99] But it also eventually led to the scandal.

In sum, if the world posited by free-market economics were realistic, we would expect that the market would create disincentives to behave the way Wells did. But the market seems not to have done that, at least not until regulators became involved. In fact, Wells Fargo's use of arbitration clauses, sanctioned by the market, may have prolonged its fraud. If the extraordinary attention given to the Wells fraud—nationwide media attention, regulatory intervention, congressional hearings, and proposed legislation—elicited such a modest market response, it is difficult to see why a financial institution would fear a stern response from the market to less egregious behavior or conduct did not inspire a penalty from regulators.

## C.  Is Informal Dispute Resolution a Substitute for Collective Action?

Free-market supporters of arbitration clauses have mounted a secondary argument. While arbitration defenders have generally not taken issue with the findings that consumers do not understand arbitration clauses,[100] two commentators, Professors Johnston and Zywicki, have

---

[99] See Shaev v. Baker, Case No. 16-cv-05541-JST (N.D. Ca. May 4, 2017) (quoting the Wells 2010 annual report as describing Wells as "the king of cross-sell"); E. Scott Reckard, Lawsuits put heat on Wells Fargo but investors barely notice, L. A. Times, May 14, 2015 (Wells "boasts of selling more add-on products to customers than any other financial institution."); Elizabeth Warren, This Fight is Our Fight 231 (2017) ("One of Wells Fargo's big marketing points to investors and stock analysts was that it was a genius at 'cross-selling.' . . . Every three months, . . . John Stumpf, . . . got on the phone . . . and talked about . . .  his bank's genius at cross-selling. And when he did this, the bank's stock price went up and up . . . .").

[100] Indeed, one industry trade association seemingly conceded that consumers do not read arbitration clauses in its comments on the CFPB's proposal to conduct its survey.  See American Financial Services Association, Comment Letter on Telephone Survey Exploring Consumer Awareness of and Perceptions Regarding Dispute Resolution Provisions in Credit Card Agreements (Aug. 6, 2013), http://www.afsaonline.org/library/files/legal/comment_letters/CFPBArbitrationSurvey.pdf ("The results of the [proposed CFPB] Survey will undoubtedly show that the vast majority of consumers are not aware of most of the provisions in their card agreements . . . . [S]tudies have shown that consumers do not generally read contracts. Accordingly, if consumers do not read contracts generally, there is no reason to assume that they may read an arbitration provision, in particular . . . . [T]he [proposed CFPB telephone] Survey is likely to show that consumers are not generally aware of the arbitration provision in their credit card agreement . . . ."). Cf.  U.S. Chamber of Commerce, Statement on Examining the CFPB's Proposed Rulemaking on Arbitration: Is it in the Public Interest and for the Protection of Consumers, App. 15 (May 18, 2016) (hereinafter, Chamber of Commerce Statement) ("The only data that the Bureau's study delivers is that, unsurprisingly, consumers are not focused on arbitration clauses."); U.S. Chamber of Commerce, Comments on Proposed Rulemaking on Arbitration Agreements 31 (Aug. 22, 2016) (same).

Critics have also argued that the Bureau's survey "is completely irrelevant to determining whether regulation of arbitration is 'in the public interest and for the protection of consumers' . . . because the Bureau refused to obtain information about consumers' baseline level of knowledge of other key provisions of their credit card agreements. Without that comparative baseline, the Bureau cannot determine whether consumers pay greater, less, or the same attention to dispute resolution clauses as to other clauses . . . ." See Chamber of Commerce Statement, supra, App. 14-15 (May 18, 2016).  See also id. at 14, n. 56 (making the same complaint about Whimsy Little Contracts); U.S. Chamber of Commerce, Comments on Proposed Rulemaking on Arbitration Agreements 30-31

argued that whether consumers take arbitration provisions into account in making shopping decisions is not pertinent to the question of whether arbitration clauses should be regulated because markets function in such a way as to make it unnecessary for consumers to understand arbitration clauses.[101] They argue that because financial institutions are quick to waive disputed fees in the interest of retaining customer business, the form of dispute resolution is irrelevant.[102] They further explain:

> [W]e were able to examine data provided by a mid-sized regional bank in Texas with respect to its internal processes for resolving disputes. . . . Overall, the bank offered refunds in about 68% of cases in which a consumer complained, resulting in refunds of over $2.275 million in 2014. . . . Credit card issuers have every incentive to respond to valid complaints brought by their cardholders precisely because consumers do what they told the CFPB they would do: terminate a card when the issuer does not respond. *Given the effectiveness of this market response, consumers do not need to know anything about the details of the potential legal response they might have available when a company declines to refund charges and fees*, and they have no reason to assume that being required to arbitrate rather than litigate would be an important reason to select one card over another.[103]

---

(Aug. 22, 2016).  In fact, the statement is partly inaccurate.  Both the CFPB study and the Whimsy Little Contracts study attempted to determine the salience of arbitration clauses to consumers as compared with other contract terms, and found that some other aspects of the contract were more significant to consumers. See CFPB Study, supra note --, section 3 at 11-15 (respondents considered variety of factors in choosing credit, such as interest rate, customer service, rewards, credit limit, fees, reputation, and card acceptance, ahead of method of dispute resolution); Whimsy Little Contracts, supra note – at 40-42 (arbitration was tied for 14th most salient contract term, mentioned by about 3% of respondents).

But to the extent that the critics point out that the studies did not examine consumer comprehension of other terms, they are correct.  See also Whimsy Little Contracts, supra note --, at 73 n. 229.  Understanding of other contract terms does not bear on whether consumers recognize or grasp the effect of arbitration clauses.

[101] See Jason Scott Johnston & Todd J. Zywicki, The Consumer Financial Protection Bureau's Arbitration Study: A Summary and Critique 28-32 (2015). Johnston & Zwyicki address only the Bureau's study, but much of what they say, if it were well-taken, would also apply to *Whimsy Little Contracts*.  See also U.S. Chamber of Commerce, Comments on Proposed Rulemaking on Arbitration Agreements 28, 31-32  (Aug. 22, 2016).

[102] Johnston & Zwyicki supra note – at 30-31. They also provided the example, without any substantiation, of a financial institution that "may have inadvertently placed individual social security number information in a location on a document where it is visible to third parties . . . . in such cases, the provider may itself take corrective action, such as providing free credit monitoring . . . . " Id. at 30-31.

[103] Johnston & Zwyicki supra note – at 31-32 (emphasis added). See also Jason S. Johnston, Todd J. Zwyicki, & Michael P. Wilt, Comment on Proposed Rule on Arbitration Agreements, 12 CFR Part 1040 4, 5 (Aug. 22, 2016) (footnote omitted) ("The Bureau dismisses evidence that financial firms have a very strong, market-driven incentive to [i]nternally resolve consumer claims quickly and fairly . . . .The Bureau's data . . . shows that consumers prefer the market to the legal response for perceived service failures by a credit card company. When a company does not internally resolve disputes to the customers' satisfaction, they take their credit card business

This argument is flawed in no fewer than ten respects. First, it tells us nothing about whether other banks have made a similar calculation, or even whether the Texas bank continues the same policy today. Second, it offers no aid for the 32% of the bank's customers who did not obtain a refund. Third, it is impossible to tell from this bare statistic the reasons for the bank's decision. The bank may base its decision on any number of considerations other than whether it has acted wrongly--which would normally be the principal consideration in litigation.[104] Instead, the bank could offer a refund because it finds the risk of losing a particular customer's patronage sufficiently great if it does not, or deny a refund because it expects the customer to maintain the account regardless of what the bank does. Or the bank could base its decisions on whether or not the customer's business is sufficiently remunerative to justify forgoing the lost fee.[105] Or on any other grounds it chooses, including grounds that are considered odious and discriminatory.

Fourth, it is not clear that any of the waived fees involved bank misconduct, as in the Wells example. Professors Johnston and Zywicki later filed a comment on the CFPB's proposed regulation, together with Michael P. Wilt, in which they seemingly focused on the frequency of bank forgiveness of fees that were in fact due.[106] Similarly, in a separate report, Professor

---

elsewhere, and they are unlikely to see a need to sue."). Similar arguments have been made about consumer use of social media. See U.S. Chamber of Commerce, Comments on Proposed Rulemaking on Arbitration Agreements 273-74 (Aug. 22, 2016) ("consumers can and do use social media to stop unjustified business conduct, without the need to retain a lawyer or to turn to complex, lengthy and time-consuming class-action procedures."). While consumers aroused by social media do seem to have had an impact on some business practices, see *id*. at 73-74, social media did not stop Wells Fargo's misconduct, nor does it provide a mechanism for compensating injured consumers.

[104] See CFPB, Arbitration Agreement, supra note – at – ("even where consumers do make complaints informally, the outcome of these disputes may be unrelated to the underlying merits of the claim.").

[105] See CFPB, Arbitration Agreement, supra note – at –:

> [I]f two consumers bring the same dispute to a company, the company might resolve the dispute in favor of a consumer who is a source of significant profit while it might reach a different resolution for a less profitable consumer. Indeed, in the Bureau's experience it is quite common for financial institutions . . . to maintain profitability scores on each customer and to cabin the discretion of customer service representatives to make adjustments on behalf of complaining consumers based on such scores.

In a later comment, Johnston & Zywicki, joined by Michael P. Wilt, responded to the Bureau's statement by suggesting that profitability is an appropriate basis for deciding whether to grant consumers relief: "In practice, however, profitability seems to amount to a determination of whether the consumer is a responsible borrower who has made an inadvertent late payment or an inveterate late payer with a low average balance who is likely to leave the issuer with a large unpaid and uncollectible balance." Jason S. Johnston, Todd J. Zwyicki, & Michael P. Wilt, Comment on Proposed Rule on Arbitration Agreements, 12 CFR Part 1040 13 (Aug. 22, 2016). But this response seems to miss the mark, as it is difficult to see what bearing a customer's profitability would have had on whether Wells should have compensated the customer for injuries caused by opening an unauthorized account.

[106] The comment argued that "Even a brief survey of the online personal-finance literature indicates that, had the Bureau done more research into market incentives for financial institutions to grant refunds when consumers complain, it would have found that such reversals are common." Jason S. Johnston, Todd J. Zwyicki, & Michael P. Wilt, Comment on Proposed Rule on Arbitration Agreements, 12 CFR Part 1040 13 (Aug. 22, 2016). In support of

Johnston referred multiple times to "fee forgiveness" in connection with the information he and Professor Zywicki had obtained from the survey.[107]  There is a difference between a bank forgiving fees it is entitled to charge, because of *customer* behavior, such as an inactivity fee or a late fee, and refunding a fee because of *bank* behavior.  When, for example, a bank forgives a late fee at the request of a careless customer, the bank can expect the customer to feel grateful to the bank, and the customer might accordingly be more likely to continue banking there.  But when a bank, say, opens an account the customer has not authorized, and later refunds fees charged on the account, the customer might feel that the bank has done no more than it should have done, and so might feel gratitude is not warranted.  Consequently, the fact that a bank is willing to adopt a strategy of currying favor with customers by forgoing fees that are due might not shed any light on what the bank does when the bank is at fault.

Fifth, it is not certain that disappointed consumers will in fact take their business elsewhere, even when the bank has acted wrongly.  Fewer than 60% of the Bureau's survey respondents indicated that they would cancel their credit card if their credit card issuer charged them a fee that they had not signed up for—[108] a number not that different from the percentage of the Texas bank's customers who obtained refunds.[109]  The implication is that banks need not fear loss of patronage from a substantial minority of customers.  And of course, while customers may predict that they will close their accounts during a telephone survey, when the issue actually arises, they may decide differently.  Consumers faced with actually closing bank accounts may find the inconvenience of doing so causes them to change their plans instead of their bank.   According to a Consumers Union report, "[s]witching bank accounts takes time, money and substantial attention to detail . . ."[110]  That may explain in part why Wells Fargo, within months of its fraud

---

this claim, the authors cite an article reporting on a survey finding that 86% of customers who have sought reversal of a late payment fee have obtained it.  See Kerri Anne Renzulli, The Crazy Easy Trick to Getting a Credit Card Fee Waived or Your Rate Lowered, Time, Sept. 25, 2014, http://time.com/money/3425668/how-to-get-credit-card-fee-waived-rate-lowered/.  The comment failed to note, however, that the article indicated that consumers are more likely to obtain the fee waiver if they are older or higher-income—again, factors which do not bear on whether the financial institution engaged in misconduct.  Moreover, as the fees in question amounted to $26 or less, the survey offers little guidance for how banks respond when the amounts at issue are larger, as in the Wells example.

[107] See Jason Scott Johnston, Class Actions and the Economics of internal Dispute Resolution and Financial Fee Forgiveness, Manhattan Institute Report (Preliminary) (Aug. 2016), https://www.manhattan-institute.org/html/class-actions-and-economics-internal-dispute-resolution-and-financial-fee.

[108] CFPB Arbitration Study, supra note --, section 3 at 18.

[109] The Bureau's finding was confined to credit card accounts. Consumers may incur greater switching costs for other financial products, such as checking accounts, see infra note – and accompanying text, and so fewer may switch checking account providers.  See Arbitration Agreements supra note – at 259 n. 550.

[110] See Suzanne Martindale, Lauren Bowne, & Christina Tetreault, Trapped at the Bank: Removing Obstacles To Consumer Choice In Banking 19 (2012), http://consumersunion.org/wp-content/uploads/2013/09/TrappedAtTheBank1.pdf. See also *id*. at 1:

becoming national news, experienced an increase in its number of deposits and checking accounts.[111] Indeed, it is not even certain that the consumer will notice an improperly charged fee or challenge it if the consumer becomes aware of it.[112]

Sixth, a waived fee does little for consumers who seek more than a refund.[113]  Recall Mr. Brodie, the Wells customer whose credit score allegedly dropped because of an unauthorized account, and who consequently was charged higher interest rates on other loans.[114] Reimbursement of fees on an unauthorized account is hopelessly inadequate redress for such a consumer.

A seventh problem is Johnston and Zywicki's assumption that financial institutions wish to retain the customer's good will.  That is surely true in many markets, including markets in which Wells operates, but in others--such as debt collection or mortgage or student loan servicing--consumers cannot choose their counterparties, and so retention of consumer good will is less valuable to businesses.[115] Indeed, one reason sometimes given for Congress to enact the Fair Debt Collection Practices Act in a form which regulates the behavior of debt collectors but largely leaves original creditors unregulated is that external debt collectors are less likely to be restrained by concerns for consumer good will.[116]

---

We found that indeed it can be a hassle to move one's money – because, simply put, it takes time and money to move your money. The process takes several steps and banks don't always make it clear how to close accounts. Consumers face many obstacles, such as: the transfer of automatic deposits and debits from the old account to the new account; wait times while automatic deposit and debit transfers are processed; fees for closing accounts or for certain methods of receiving or transferring remaining balances; risk of old accounts reopening; and inadequate information about bank account closing policies.

See also Haiyan Shii & Lawrence M. Ausubel, Time Inconsistency in the Credit Card Market, Time Inconsistency in the Credit Card Market (2004), 14th Annual Utah Winter Finance Conference. https://ssrn.com/abstract=586622 (finding consumers reluctant to switch between credit cards and that average switching cost is $150).

[111] See supra note – and accompanying text.

[112] See, e.g., Arthur Best & Alan R. Andreasen, Consumer Response to Unsatisfactory Purchases: A Survey of Perceiving Defects, Voicing Complaints, and Obtaining Redress, 11 L. & Soc. Rev. 701, 712 (1977) (only 30.7% of consumers noticing problems complain); Rex H. Warland, et al., Dissatisfied Consumers: Who Gets Upset and Who Takes Action, 9 J. Consumer Aff. 148, 152 (1975) (study finds about half of consumer do not complain to seller or external agency when dissatisfied).

[113] See CFPB, Arbitration Agreements, supra note – at 100 ("Nothing requires a company to . . . award complete relief to that consumer . . . .").

[114] See supra note – and accompanying text.

[115] See Arbitration Agreements, supra note – at 100 n. 100.

[116] See Jerry D. Brown, Painting a Mustache on the Mona Lisa –How Tinkering with the Validation Notice Will Get You Every Time, 53 Consumer Fin. L.Q. 42 (Winter 1999) ("in-house collectors (at least theoretically) will use self

An eighth flaw in the argument is that if such private resolution of problems were completely effective, we would expect that few consumers would complain to the CFPB's complaint database, or at least no one who does so would obtain relief, because they would already have been satisfied by the company. Yet the Bureau reports having received more than 1,100,000 complaints, and in one recent year, nearly a fifth of complaining consumers obtained some relief.[117]

Ninth, even assuming that all financial institutions employ a similar policy and refund fees for all consumers entitled to such a refund, the argument still proves too much. Taken to its logical conclusion, Johnston and Zwyicki's contention suggests that financial institutions—and indeed, any business that fears loss of a customer's patronage—would never violate the law and so should be immune from suit in any forum. Their theory argues that businesses which depend on customer good will should always value that good will enough to resolve disputes in favor of the customer. But that obviously is not true, as the Wells Fargo example itself demonstrates. Countless other cases do as well, including class actions.[118] Indeed, since its inception in 2011, the CFPB has secured nearly $12 billion in relief for more than 29 million consumers.[119]

Tenth, Johnston and Zywicki overlook the deterrent function of class actions.[120] Financial institutions risking a class action for misconduct have a significant incentive to refrain from misbehavior. If, on the other hand, financial institutions know that they can cheat customers and still retain consumer good will by refunding the fees of complaining consumers, they have a much reduced incentive to avoid misconduct in amounts. That seems especially likely to be true when damages are small enough that few consumers will bother to pursue the matter, whether in court or arbitration.[121]

---

control in collecting debts, because they want repeat business from the consumer."). The FDCPA is codified at 15 U.S.C.A. § 1692 et seq.

[117] The CFPB report of more than 1,100,000 complaints appears on its website, see https://www.consumerfinance.gov/. See also CFPB, CONSUMER RESPONSE ANNUAL REPORT JANUARY 1 – DECEMBER 31, 2015 43 (2016) (6% of complaining consumers obtained monetary relief and 12% secured non-monetary relief), http://files.consumerfinance.gov/f/201604_cfpb_consumer-response-annual-report-2015.pdf.

[118] For an example of a class action in which the court imposed liability on a financial institution for unfair and fraudulent conduct, see Gutierrez v. Wells Fargo Bank, 704 F.3d 712 (N.D. Ca. 2010), aff'd in pertinent part, 704 F.3d 712 (9th Cir. 2012). Similarly, the CFPB Arbitration Study summarizes class actions brought against eleven banks arising out of overdraft reordering that resulted in settlements with 6,493,837 consumers and payments of $377,430,000. See CFPB Study supra note – at Section 8, p. 43.

[119] See https://www.consumerfinance .gov.

[120] See supra note --.

[121] See supra note – and accompanying text.

### D. More on Consumer Behavior

Another way of understanding Johnston and Zywicki's theory is that it implies that consumers have made a conscious decision not to concern themselves about how disputes will be resolved out of a belief that financial institutions will so value their patronage that the institution will accede to their requests. Perhaps some consumers—economists, perhaps--indeed go through such a thought process.  But given that many of the respondents in the *Whimsy Little Contract* study believed that even properly-written arbitration clauses would not bind them,[122] an explanation that is at least as plausible is that consumers—wrongly--believe that arbitration clauses are not enforceable and so are not worth their attention. The well-known optimism bias—the tendency of consumers to be unduly optimistic--[123] may also play a role here, in that consumers may think that nothing in the contract matters.

But these explanations probably presuppose that consumers give more thought to whether to read contracts than is in fact the case.  The widespread reluctance of consumers to read contracts has been well documented.[124]  For example, in one study, 543 college students were offered a chance to sign up for a new social network and were given the opportunity to read the Terms of Service and privacy policy.[125] Though the Terms of Service would have taken the typical person sixteen

---

[122] See supra note – and accompanying text.

[123] *See* David A. Armor & Shelley E. Taylor, *When Predictions Fail: The Dilemma of Unrealistic Optimism*, *in* HEURISTICS AND BIASES: THE PSYCHOLOGY OF INTUITIVE JUDGMENT 334, 334 (Thomas Gilovich et al. eds., 2002) ("One of the most robust findings in the psychology of prediction is that people's predictions tend to be optimistically biased."); Melvin Aron Eisenberg, *The Emergence of Dynamic Contract Law*, 88 CAL. L. REV. 1743, 1782 (2000) (stating that contracting parties tend to be "unrealistically optimistic"); Christine Jolls, *Behavioral Economics Analysis of Redistributive Legal Rules*, 51 VAND. L. REV. 1653, 1659 (1998) ("[P]eople are often unrealistically optimistic about the probability that bad things will happen to them. A vast number of studies support this conclusion."); Neil D. Weinstein, *Unrealistic Optimisim About Future Life Events*, 39 J. PERSONALITY & SOC. PSYCHOL. 806, 806, 818-19 (1980); *see also* Dale Griffin & Amos Tversky, *The Weighing of Evidence and the Determinants of Confidence*, *in* HEURISTICS AND BIASES: THE PSYCHOLOGY OF INTUITIVE JUDGMENT, *supra*, at 230, 248 ("Although overconfidence is not universal, it is prevalent, often massive, and difficult to eliminate ...."); Hillman & Rachlinski, Robert A. Hillman & Jeffrey J. Rachlinski, *Standard-Form Contracting in the Electronic Age*, 77 N.Y.U. L. REV. 429, 454 (2002) ("People intending to purchase a product likely will overstate their own ability to assess the reputationand good faith of the person or company with whom they are interacting."); Dan N. Stone, *Overconfidence in Initial Self-Efficacy Judgments: Effects on Decision Processes and Performance*, 59 ORGANIZATIONAL BEHAV. & HUM. DECISION PROCESSES 452, 453-54, 468 (1994) (citing studies that demonstrate consumer optimism). For examples of optimistic behavior, see Cass R. Sunstein, *Hazardous Heuristics*, 70 U. CHI. L. REV. 751, 772-74 (2003) (reviewing THOMAS GILOVICH ET AL., HEURISTICS AND BIASES: THE PSYCHOLOGY OF INTUITIVE JUDGMENT (2002)) ("With respect to most of the risks of life, people appear to be unrealistically optimistic.").

[124] See generally Whimsy Little Contracts, supra note – at 15-17; OMRI BEN-SHAHAR & CARL E. SCHNEIDER, MORE THAN YOU WANTED TO KNOW: THE FAILURE OF MANDATORY DISCLOSURE (2014).

[125] See Jonathan A. Obar & Anne Oeldorf-Hirsch, T*he Biggest Lie on the Internet: Ignoring the Privacy Policies and Terms of Service Policies of Social Networking Services*, TPRC 44: The 44th Research Conference on Communication, Information and Internet Policy (2016).

minutes to read, the average student devoted less than a minute to it.[126] That may explain why all the students agreed to it, even though it obliged them to surrender their first-born child.[127] Similarly, an online company with a whimsical streak ended up the owner of the souls of 7,500 consumers, under its contract.[128] Nor are ordinary consumers alone in ignoring such documents. Chief Justice Roberts,[129] Judge Richard Posner,[130] and other legal luminaries[131] acknowledge that they don't read contract terms.

If consumers do not read contracts, a system based on the assumption that they do can hardly be expected to reach optimal results. The practice of not reading contracts is so widespread that it is more plausible to say that reasonable people do not read contracts than to say that they do. A legal regime that penalizes people for following a universally-observed custom makes little sense. Indeed, it is difficult to see why people should be penalized for not reading contracts that they do not understand and do not believe are enforceable.

The attack on free-market economics finds support in the work of scholars like Richard H. Thaler and Cass R. Sunstein.[132] Thaler and Sunstein have argued that too much economic theory is based on imaginary people they call "Homo Economicus" or "Econs:" rational people who do

---

[126] *Id.*

[127] *Id.*

[128] See 7,500 Online Shoppers Unknowingly Sold Their Souls, Fox News, April 15, 2010, http://www.foxnews.com/tech/2010/04/15/online-shoppers-unknowingly-sold-souls.html. See also Debra Pogrund Stark & Jessica M. Choplin, A License to Deceive: Enforcing Contractual Myths Despite Consumer Psychological Realities, 5 N.Y.U. J. L. & Bus. 617 (2009) (after experimenters had subjects sign a phony consent form that required signers to administer electric shocks and advised against signing the consent, experimenters had subjects sign a genuine consent—which 17% signed without reading and the average subject spent 16 seconds reading); *Whimsy Little Contracts* supra note – at 36 (average respondent spent enough time with the credit card contract to read only 14% of it).

[129] *See Chief Justice Roberts Admits He Doesn't Read the Computer Fine Print*, ABA J. (Oct 20, 2010), http://www.abajournal.com/weekly/article/chief_justice_roberts_admits_he_doesnt_read_the_computer_fine_print?utm_source=maestro&utm_medium=email&utm_campaign=weekly_email.

[130] See *Judge Posner Admits He Didn't Read Boilerplate for Home Equity Loan*, ABA J. (Jun 23, 2010), http://www.abajournal.com/weekly/article/judge_posner_admits_he_didnt_read_boilerplate_for_home_equity_loan

[131] Daniel White, Read Hillary Clinton's Remarks from a Rally in Toledo, Ohio, Time (Oct. 3, 2016), time.com/4517335/hillary-clinton-transcript-toledo-ohio/ (speaking of arbitration clauses: "You know, who reads all that fine print? I don't. And you get defrauded or you get mistreated and then all the sudden they, well you can't sue us.").

[132] *See* Richard H. Thaler and Cass R. Sunstein, *Nudge: Improving Decisions About Health, Wealth, and Happiness* (2009).

not behave as behavioral economics has shown actual people do.[133] As Nobel laureate Daniel Kahneman has written:

> In a nation of Econs, government should keep out of the way, allowing the Econs to act as they choose . . . . Humans, more than Econs, also need protection from others who deliberately exploit their weaknesses . . . . An Econ will read and understand the fine print of a contract before signing it, but Humans usually do not. An unscrupulous firm that designs contracts that customers will routinely sign without reading has considerable legal leeway in hiding important information in plain sight.[134]

Financial institutions like Wells Fargo that use arbitration clauses that consumers cannot process fit within the description of firms hiding information in plain sight.[135]

I have argued elsewhere that just as economists who strive for realistic models have moved from assuming that people are Econs to taking into account predictable irrationalities, law-makers should undergo a similar transition from creating rules based on unrealistic assumptions about human behavior--such as that people ("Homo Lex" or "Lexons") read contracts—to crafting rules that take into account actual behavior.[136] In the context of arbitration clauses, such an approach would do exactly what the CFPB has proposed to do: substitute for rules founded in ideology rules based on empirical research into what is in consumers' best interest when such

---

[133] *See, e.g.*, Daniel Kahneman, *Thinking Fast and Slow* (2011); Richard H. Thaler, *Misbehaving: The Making of Behavioral Economics* (2015); Dan Ariely, *Predictably Irrational: The Hidden Forces That Shape Our Decisions* (2009).

[134] *See* Daniel Kahneman, *Thinking Fast and Slow* 412-13 (2011). Kahneman goes on to suggest that disclosures in simple text and large print might solve the problem, but Whimsy Little Contracts, because it tested awareness of a term that was printed in italics, bold, and partly in ALLCAPS, indicates that prominent text is not by itself a solution. In addition, because many consumers believe class action waivers are unenforceable, even providing such a waiver in simple language would not cure the problem.

[135] Similarly, Russell Korobkin has argued that as to terms that are not salient to consumers, which is true of arbitration clauses, see note – and accompanying text supra, businesses have an incentive to include terms that favor the businesses regardless of whether the terms are efficient. See Russell Korobkin, Bounded Rationality, Standard form Contracts, and Unconscionability, 70 U. Chi. L. Rev. 1203, 1206 (2003):

> Assuming that price is always a salient product attribute for buyers, market competition actually will force sellers to provide low-quality non-salient attributes in order to save costs that will be passed along to buyers in the form of lower prices. Ironically, the consequences of market forces in a world of boundedly rational buyer decisionmaking is that contracts will often include terms that are socially inefficient, leave buyers as a class worse off . . . than they would be if their contracts included only efficient terms, and leave sellers as a class worse off as well.

Thus, the mere fact that businesses choose to include arbitration clauses in their contracts does not mean that arbitration clauses are efficient and government regulation is unnecessary.

[136] See Jeff Sovern, Are Validation Notices Valid? An Empirical Evaluation of Consumer Understanding of Debt Collection Validation Notices, 75 S.M.U.L. Rev. – (forthcoming, 2017).

research demonstrates that consumers do not understand arbitration clauses well enough to protect themselves. Doing anything else runs the risk of not sufficiently incentivizing the Wells Fargos of this world to resist the temptation to take advantage of consumers.

### E. Returning to the Broader Context: Mechanisms to Restrain Business Misconduct

Of the four mechanisms that could restrain companies from misconduct, two--self-restraint and the market—were ineffective when it came to Wells, and in fact, the free market might have exacerbated the problem. The third, lawsuits from injured consumers, were largely disabled by the Wells arbitration clause. Only the fourth, governmental intervention, was effective.

Is government action sufficient, as some arbitration advocates have argued?[137] The Bureau Study found that "public enforcement is not itself a sufficient means to enforce consumer protection laws."[138] In any event, the same members of Congress that seek to block the Bureau from banning class action waivers in consumer financial contracts are also seeking to limit or even eliminate the CFPB as well.[139] Indeed, House Financial Services Chair Jeb Hensarling's proposed Financial Choice Act would abolish the authority the CFPB used to force Wells to agree to the consent order concerning unauthorized accounts.[140] If the free-marketers succeed,

---

[137] American Bankers Assoc., Consumers Bankers Assoc., & Financial Serv. Roundtable, Comments on the Bureau's Proposed Arbitration Rule 16-18 (Aug. 22, 2016); U.S. Chamber of Commerce, Comments on the Bureau's Proposed Arbitration Rule 4-5 (Aug. 22, 2016).

[138] See Arbitration Agreements, supra note – at 32,860. See generally CFPB Arbitration Study supra note – at Section 9.

[139] See, e.g., S. 370 (115th Cong., 1st Sess.), https://www.cruz.senate.gov/files/documents/Bills/20170214_S.370_CFPB.pdf? (bill would eliminate CFPB); Jeff Sovern, Ratcliffe/Cruz Bill Would Eliminate the CFPB, Consumer L. & P. Blog (Feb. 15, 2017), http://pubcit.typepad.com/clpblog/2017/02/ratcliffecruz-bill-would-eliminate-the-cfpb.html.

[140] The Bureau used its powers to prevent financial institutions from engaging in unfair or abusive practices under 12 U.S.C. section 5531 to restrain Wells. See Consent Order, supra note -. Section 736 of the Financial Choice Act, at https://www.congress.gov/bill/115th-congress/house-bill/10/text?q=%7B%22search%22%3A%5B%22HR+10%22%5D%7D&r=1#toc-H0A648DFC96BC40B8BDF0737B1A66C82C, would repeal those powers. Two other regulators joined the CFPB in its action against Wells: the Office of the Comptroller of the Currency ("OCC") and the Los Angeles City Attorney, though the fines they levied against Wells were smaller even when combined than the Bureau's fine. Presumably, neither of those offices would be affected by the Financial Choice Act, and so could still have proceeded against Wells even if the Bureau could not have. But relegating enforcement to the OCC raises concerns about how effective it would be at protecting consumers. While the Office of the Consumer Financial Protection Bureau was established, as its name implies, solely to protect consumers, see 12 USC 5511(a) ("The Bureau shall seek to implement and, where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive."), the OCC has a broader set of goals. See Office of the Comptroller of the Currency, About the Office of the Comptroller of the Currency (OCC), https://www.occ.gov/annual-report/about-the-occ/index-about-the-occ.html ("The mission of the OCC is to ensure that the federal banking system, . . .operates in a safe and sound manner, provides fair access to financial services,

consumers wishing to avoid being defrauded will be forced to depend on market sanctions or financial institutions' consciences—both of which proved inadequate as to Wells until regulators intervened.[141]  In such a scenario, it is not clear what would discourage financial institutions from maximizing earnings by engaging in misconduct that injures many individuals only slightly. Possibly even worse is that companies that increased shareholder returns in such a fashion might drive more scrupulous companies with lower returns out of the marketplace.

### Conclusion

Free-market advocates claim that the free market produces ideal outcomes for consumers, thus obviating the need for government regulation.  Yet when it came to the Wells Fargo phony account fiasco, which surely ranks among the most significant recent bank scandals, the free market failed in multiple respects.  First, it failed to discipline Wells.  Indeed, the number of active checking accounts increased during the period that the Wells fraud drew public attention, suggesting that at least some consumers were not dissuaded from banking at Wells by its misconduct.

Second, the free market may have facilitated the Wells fraud by enabling Wells to avoid class action litigation over the fraud, if it wished to.  Had Wells faced the risk of a class action, it might have taken steps earlier to end its fraud, for fear of incurring excessive liability for its misbehavior.  But Wells inserted in its contracts an arbitration clause barring class actions. The Consumer Financial Protection Bureau has proposed the elimination of such class action waivers in arbitration clauses.  The proposed regulation would enable consumers to pursue class actions, which should deter financial institution misconduct.  But free-market law-makers wish to

treats customers fairly, and complies with applicable laws and regulations."). Moreover, the OCC has a history of being captured by banks, and if that had been the case during the Wells Fargo investigation, it is conceivable that the OCC would have been less aggressive. For example, during the George W. Bush administration, the OCC was led by a former bank lawyer and lobbyist, John Dugan.  During that administration, much of which coincided with the period in which subprime lenders were making predatory loans that contributed to the subprime lending crisis that in turn led to the Great Recession, the OCC proclaimed that state anti-predatory lending laws were preempted as to national banks. 12 C.F.R. § 34.4. The OCC also sued to prevent state attorneys general from enforcing fair lending laws as to national banks. See Cuomo v. Clearing House, 557 U.S. 519 (2009). In the actual Wells Fargo example, an internal OCC review found that the "OCC did not take timely and effective supervisory actions after the bank and the OCC identified significant issues . . . ." Office of Enterprise Governance and the Ombudsman, Office of the Comptroller of the Currency, Enterprise Governance Supervision: Lessons Learned Review of Supervision of Sales Practices at Wells Fargo 4 (2017). Though the OCC was aware of the problems as early as 2010, it appears it did not pursue them beyond conducting meetings in 2010 until years later.  See id at 5.  While states could still act, and the Los Angeles City Attorney was the first governmental entity to sue Wells over the unauthorized accounts, individual states face jurisdictional limits that limit their effectiveness as nationwide regulators.

[141] Perhaps the best-known recent example of the failure of financial institutions' consciences can be found in the subprime lending that led to the Great Recession. See generally Jeff Sovern, Preventing Future Economic Crises through Consumer Protection Law or How the Truth in Lending Act Failed the Subprime Borrowers, 71 Ohio St. L. J. 763, 805-807 (2010).

abrogate the Bureau's power to regulate arbitration clauses, thereby doing away with that deterrent effect.

Legislators who wear the mantle of the free market may be doing free-market economics an injustice. Free-market theory assumes that consumers understand their contracts, and studies show that consumers do not comprehend arbitration clauses or class action waivers. If consumers do not understand such terms, it is unreasonable to expect them to realize that the contracts they sign strip them of their right to bring a class action against a bank that opens accounts that the consumers have never agreed to. In short, a class action waiver, as proposed by the CFPB, might well have brought an early end to the Wells scandal, and saved consumers a great deal of pain.

**Figure One: Wells Fargo Primary Consumer Checking Customers Increase From Previous Year[142]**

2016:   Quarter 4: 3.5%[143]

        Quarter 3: 4.7%[144]

        Quarter 2: 4.7%[145]

        Quarter 1: 5.0%[146]

2015:   Quarter 4: 5.6%[147]

        Quarter 3: 5.8%[148]

        Quarter 2: 5.6%[149]

        Quarter 1: 5.7%[150]

2014:   Quarter 4: 5.2%[151]

        Quarter 3: 4.9%[152]

        Quarter 2: 4.6%[153]

---

[142] Wells defines "Primary consumer checking customers" as "customers who actively use their checking account with transactions such as debit card purchases, online bill payments, and direct deposit." See Wells Fargo, News Release, Wells Fargo Reports $5.3 Billion in Quarterly Net Income 8 n.5 (Jan. 13, 2017).

[143] Wells Fargo, News Release, Wells Fargo Reports $5.3 Billion in Quarterly Net Income 8 (Jan. 13, 2017)

[144] Wells Fargo, News Release, Wells Fargo Reports $5.6 Billion in Quarterly Net Income 8 (Oct. 14, 2016).

[145] Wells Fargo, News Release, Wells Fargo Reports $5.6 Billion in Quarterly Net Income 8 (July 15, 2016).

[146] Wells Fargo, News Release, Wells Fargo Reports $5. Billion in Quarterly Net Income 8 (Apr. 14, 2016).

[147] Wells Fargo, News Release, Wells Fargo Reports $5.7 Billion in Quarterly Net Income 8 (Jan. 15, 2016).

[148] Wells Fargo, News Release, Wells Fargo Reports $5.8 Billion in Quarterly Net Income 8 (Oct. 14, 2015).

[149] Wells Fargo, News Release, Wells Fargo Reports $5.7 Billion in Quarterly Net Income 8 (July 14, 2015).

[150] Wells Fargo, News Release, Wells Fargo Reports $5.8 Billion in Quarterly Net Income 9 (Apr. 15, 2015).

[151] Wells Fargo, News Release, Wells Fargo Reports Record Full Year Net Income 9 (Jan. 14, 2015).

[152] Wells Fargo, News Release, Wells Fargo Reports $5.7 Billion in Quarterly Net Income 9 (Oct. 14, 2014).

Quarter 1: 5.1%[154]

2013:   Quarter 4: 4.7%[155]

Quarter 3: 3.9%[156]

Quarter 2: 3.5%[157]

Quarter 1: 2.1%[158]



Wells Fargo Primary Consumer Checking Customers Increase From Previous Year

---

[153] Wells Fargo, News Release, Wells Fargo Reports $5.7 Billion in Quarterly Net Income 9 (July 11, 2014).

[154] Wells Fargo, News Release, Wells Fargo Reports Record Quarterly Net Income 9 (Apr. 11, 2014).

[155] Wells Fargo, News Release, Wells Fargo Reports Record Full Year and Quarterly Net Income 9 (Jan. 14, 2014).

[156] Wells Fargo, News Release, Wells Fargo Reports Record Quarterly Net Income 9 (Oct. 11, 2013).

[157] Wells Fargo, News Release, Wells Fargo Reports Record Quarterly Net Income 9 (July 12, 2013).

[158] Wells Fargo, News Release, Wells Fargo Reports Record Quarterly Net Income 10 (Apr. 12, 2013).